<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILLIAM SAMPLE, | Civil Action No. 12-5538 (SDW) |
| Plaintiff, | |
| v. | |
| | **OPINION** |
| MARKETSTAR CORP., *et al.,* | |
| Defendants. | August 7, 2014 |

**WIGENTON,** District Judge

Before the Court is Marketstar Corporation's ("Marketstar" or "Defendants") Motion for Summary Judgment ("Motion") pursuant to Federal Rule of Civil Procedure 56(c). This Court has jurisdiction pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b). This motion is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated below, this Court grants in part and denies in part Defendants' Motion.

**I. FACTUAL AND PROCEDURAL HISTORY**

This lawsuit arises from Defendants' termination of William Sample ("Sample" or "Plaintiff"). In his September 4, 2012 complaint, Sample, an African American male, alleges that he was subjected to a hostile work environment and terminated in retaliation for reporting a

Caucasian co-worker's racially insensitive remarks, in violation of New Jersey Law Against Discrimination, N.J.S.A. 10-5:1 et. seq. ("NJLAD") (Count I), and New Jersey's Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et. seq. ("CEPA") (Count II). (Compl. ¶¶ 5-20.) On December 17, 2013, Marketstar moved for summary judgment. Defendants submit that Sample was terminated for a legitimate, non-discriminatory reason: his poor job performance. (Defs' Br. p. 3.) The Court summarizes the facts for the purpose of this opinion:

Between November 2007 and January 2012, Defendants employed Sample as a District Manager. (Defs.' Statement of Undisputed Material Facts ("Def. SUF") ¶ 1.) Defendants provide sales support for Verizon Communications Inc. ("Verizon") in its retail stores throughout New Jersey. (Id.) Plaintiff's duties included, but were not limited to, ensuring that each of the fourteen Verizon stores within his assigned territory were "opened on time, adequately staffed with properly trained and properly attired Marketstar employees[,] and were reaching the sales goals" set by Verizon. (Def. SUF ¶ 3.) As such, Plaintiff was required to pay regular in-person visits to the stores in his territory. (Id.)

For the first three years of his employment, Plaintiff received minimal supervision. (Def. SUF ¶ 5.) However, beginning in 2010, Marketstar and Verizon increased operational oversight of Verizon stores. (Def. SUF ¶¶ 7-11.) Consequently, Sample reported directly to Area Manager Jon Solovey ("Solovey"), and indirectly to Deann MacLeod ("MacLeod"), Marketstar's Sales Operation Manager, and Joseph Cheney ("Cheney"), Marketstar's Director of Client Services and head manager of the Verizon account. (Def. SUF ¶¶ 7-8.) In March 2011, Verizon hired Karen Markson ("Markson"), a Caucasian female, as a first-level supervisor. (Id. ¶ 11.) Markson's territory included Plaintiff's stores. Id.

*Alleged Inappropriate Racial Remarks*

On October 28, 2011, Sample told Solovey that he was informed that Markson said Shawnta Dawson ("Dawson"), an African American employee, should be moved from the Verizon store in Westfield to the Newark location to be "with her own kind." (Scirocco Decl., Ex. C.) Allegedly, Markson further stated that she would "ride" Dawson to make the relocation a "performance issue." (Id.) The report was forwarded to Marketstar's Human Resources Manager, Kim Kaleikini ("Kaleikini"), who promised to investigate the comments and inform Verizon's Human Resources Department of her findings. (Scirocco Decl., Ex. C.) Sample was in charge of hiring staff for the Newark and Westfield locations at the time. (Sample Dep. p. 40:2-22.) Markson never asked Sample to reassign Dawson to the Newark location and he never did so. (Id. at 41:3-9; 227:25-228:3.)

On November 8, 2011, Plaintiff lodged a second complaint against Markson. (Pl. Br. 5; Scirocco Decl., Ex. E.) In an e-mail addressed to Kaleikini, Solovey, and MacLeod, Sample reported that on or about November 5, 2011, Markson commented that Angel Santana ("Santana"), a Hispanic associate at the Newark location, was a recovering drug addict who lived in "a drug-infested area of Jersey City." (Id.) In the resulting email chain, Solovey and Kaleikini discussed plans to refer the matter to Verizon. (O'Reilly Decl., Ex. 23.) Kaleikini testified that by January 2012, she had interviewed the three Marketstar employees who allegedly heard Markson's comments first-hand and communicated her findings to Verizon. (Def. R. SUF ¶ 34; Kaleikini Dep., 22:1-23:11, 42:1-12.) However, in an email to Rosemary Tavarez, a Verizon Human Resources representative, dated February 8, 2012, Kaleikini stated she was writing to report "serious allegations" involving a Verizon employee. (Scirocco Decl., Ex. T.)

3

*Sample's Alleged Performance Issues*

Marketstar contends that Plaintiff was terminated due to performance deficits which became apparent after Marketstar overhauled its management protocol in early 2011, well before Sample reported Markson's comments. (Def. SUF ¶¶ 12-24.) From March through May of 2011, Verizon and Marketstar managers complained about staffing shortages and late openings at a number of stores under Sample's supervision. (Def. SUF ¶¶ 17-24.) Consequently, in May 2011, Marketstar assigned Sample a "District Coach" to help him manage his work load. (Def. SUF ¶ 15.)

Defendants allege that Sample's job performance continued to suffer despite the added help. On September 7, 2011, Diane Connors ("Connors"), Verizon's Regional Marketing Manager, emailed Plaintiff to complain that several stores in his territory opened late without notice to Verizon representatives. (O'Reilly Decl., Ex. 13.) Two days later, Connors also complained about the "flagrant violations" she observed while visiting one of Sample's stores, as well as Sample's frequent staffing shortfalls and delayed store openings.[1] (O'Reilly Decl., Ex. 14). Meanwhile, on September 30, 2011, Sample received a positive performance review for the months of July through September, which was prepared and signed by Solovey[2]. (Scirocco Decl., Ex. B.)

On October 7, 2011, Karriem Wardlow ("Wardlow"), a Verizon first-level supervisor, reported "serious issues" regarding staffing and store closing procedures at Plaintiff's stores in Woodbridge and Bedminster, and described Plaintiff's response to these issues as "lackadaisical

---

[1] According to Connors, late store openings were a "serious" cause for concern because under local franchise agreements, Verizon could be subject to a $100,000.00 fine for the first offense. (Connors Dep., pp. 39:8 - 40:11.)

[2] Plaintiff claims he received a favorable written performance review for the period of April through June of 2011 as well. However, that document is not in the evidence before this Court.

4

and unprofessional." (Def. SUF ¶ 27, O'Reilly Decl., Ex. 17.) Connors assured Wardlow that she would contact Solovey to "demand some type of disciplinary action for [Sample]." (Def. SUF ¶ 28.) On November 1, 2011, Connors brought these issues to Solovey's attention. (O'Reilly Decl., Ex. 21.) She also complained that Sample arrived late to a training session held the day before, was missing three members from his team, and lied to her about another employee's absence. (Def. SUF ¶ 37.)

On November 7, 2011, although Solovey recommended a verbal warning, Sample was issued a formal Notice of Caution ("NOC") citing his poor "attention to detail". (Pl. Br. 6, Ex. H.) An NOC is a written warning typically issued in the third and final phase of the disciplinary process, often prior to termination. (Pl. Br. 5-6.) Sample complained to Kaleikini that the NOC was issued as a pretext because management had no genuine concerns about his performance before he reported Markson's racist comments. (O'Reilly Decl., Ex. 25). Plaintiff believed Solovey was laying the groundwork for his termination in order to "salvage [Marketstar's] relationship with [Verizon]." (Id.)

On November 30, 2011, Kim Witmer ("Witmer"), Director of Operations at Verizon, observed several policy violations during an unannounced visit to one of Sample's stores. (Witmer Dep., pp. 17:20-20:4.) On December 1, 2011, Connors sent an email to Solovey to inform him that Plaintiff notified her, hours after he had been expected to provide coverage at one of his stores, that he would be absent for the day. (O'Reilly Decl., Ex. 33.) Sample subsequently sent Solovey an email explaining that he abruptly took ill and was undergoing tests at his doctor's office. (Scirocco Decl. Ex. II.) Connors reported this incident to Witmer and expressed her general dissatisfaction with Sample's job performance. (O'Reilly Decl., Ex. 27.) Days later, Connors and Witmer initiated a conference call with Marketstar management—

Cheney, MacLeod, and Solovey—to address Sample's performance issues. (Connors Dep., p. 48:6-20.) During that call, Witmer requested that Sample be removed from the Verizon program. (Witmer Dep., pps. 28:10-14; 29:3-14, 30:6-18.) On January 12, 2012, Witmer and Connors renewed their demand for Plaintiff's removal from the Verizon program, "with the understanding that Marketstar ha[d] other programs" to which he may be transferred. (Witmer Dep., p. 35:10-16.) Solovey proposed transferring Sample to the Delaware/Pennsylvania region of the Verizon program instead. (Connors Dep., p. 58:8-20.) Witmer opposed the idea. (Witmer Dep., p. 39:4-17.)

On January 19, 2012, Plaintiff received a second NOC, citing further decline in his job performance. (Def. SUF ¶ 65.) At that time, Plaintiff was advised that he was being transferred to the Pennsylvania/Delaware region effective immediately. (Pl. Br. 14.) However, the next day, January 20, 2012, Witmer told Cheney that Verizon would pull its business from Marketstar if Sample remained in the Verizon program. (Def. SUF ¶ 70.) Cheney testified that due to Sample's unsatisfactory job performance and the unavailability of comparable positions at Marketstar outside the Verizon account at the time, his employment was terminated on January 27, 2012. (Def. SUF ¶ 71.)

## II.  LEGAL STANDARD

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)). In deciding a motion for summary judgment, the Court must construe the

facts and inferences in a light most favorable to the non-moving party. Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).

"'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case.'" Conoshenti v. Public Serv. Elec. & Gas, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting Celotex, supra, 477 U.S. at 325). The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## III. ANALYSIS

### A. *Motion to Strike Plaintiff's Certification.*

As a preliminary matter, Defendants urge the Court to disregard Plaintiff's certification, submitted along with his opposition to this motion, under the "sham affidavit doctrine." (Def. R. Br. 8-11) The Federal Rule of Civil Procedure Rule 56(e) "permits consideration of affidavits in summary judgment proceedings." Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 252 (3d Cir. 2007); see Fed. R. Civ. P. 56(e). The sham affidavit doctrine prohibits a party from "'creat[ing] a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict.'" Id. at 251 (quoting Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004)). As the Third Circuit held in Jiminez, "[w]hen a party does not explain the contradiction between a subsequent affidavit and a prior deposition, it is appropriate for the district court to disregard the subsequent affidavit and the alleged factual issue in dispute as a 'sham' . . ." Id. at 254.

During discovery, Plaintiff testified on three occasions that he did not personally disclose Markson's comments to Connors or to any other Verizon representative, but rather relied on Solovey's assurance that Connors would be notified. (Sample Dep. 47:23-48:11; 63:13-64:15; 216:20-217:19.) Marketstar moved for summary judgment based, partially, upon Verizon's lack of knowledge that Plaintiff engaged in activity protected by NJLAD or CEPA prior to his termination. (Def. Br. pps. 2, 18.) In the subject certification, Plaintiff alleges that he personally reported Markson's comments to "the Verizon team" during a conference call organized by Solovey on October 31, 2011. (Sample Cert. ¶ 6.)  Because Plaintiff has failed to advance an explanation for the discrepancy between his certification and his deposition testimony, this Court will disregard the certification to the extent that it suggests Plaintiff reported Markson's comments directly to Connors or other Verizon managers.

### B. *Motion for Summary Judgment.*

Defendants argue Plaintiff waived his right to bring NJLAD claims when he also alleged a CEPA violation, resting upon similar proofs, in his Complaint. (Def. Br. pps. 6-9.) Additionally, Defendants argue that the undisputed record evidence supports summary judgment on Plaintiff's CEPA claim because 1) Plaintiff has failed to establish a prima facie case of CEPA retaliation; 2) record evidence proves Marketstar had a legitimate non-retaliatory reason for terminating Sample's employment, and 3) his termination was not pretexual because record evidence shows that the Verizon decision-makers who demanded Sample's removal from the Verizon account were unaware that he made a complaint about Markson.

**COUNT I: PLAINTIFF'S NJLAD CLAIMS.**

Plaintiff concedes the waiver of his NJLAD retaliation claim "for the purposes of this motion," but nonetheless maintains that he has raised a freestanding NJLAD hostile work

environment claim which survives CEPA's waiver provision. Plaintiff's NJLAD hostile work environment claim is subsumed within his NJLAD retaliatory claim and is likewise subject to the CEPA waiver because it is predicated upon a singular factual premise: that Plaintiff was subjected to a hostile work environment and then abruptly fired in retaliation for seeking official reprimand of a co-worker who made racist comments.

CEPA's waiver provision states that:

*[T]he institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law.*

N.J.S.A. § 34:19-8. NJLAD protects employees from discrimination because of, among other things, race, color, or national origin. N.J.S.A. § 10:5-4. Although not every NJLAD claim is waived by the assertion of a CEPA claim, "retaliation claims under [NJLAD] necessarily fall within the CEPA waiver provision." See, Ehling v. Monmouth-Ocean Hosp. Serv. Corp., 961 F. Supp. 2d 659, 672 (D.N.J. 2013); Ivan v. Cnty. of Middlesex, 595 F. Supp. 2d 425, 465-66 (D.N.J. 2009). Further, "[t]he waiver provision applies to claims that are 'substantially related' to the CEPA claim . . . . Conversely, claims that do not require a showing of retaliation and require a showing of different proofs are not waived by the institution of the CEPA claim." Espinosa v. Cnty of Union, No. 01-CV-3655, 2005 U.S. Dist. LEXIS 36563, 2005 WL 2089916, at *1 (D.N.J. 2005) (internal citations omitted); see also Casper v. Paine Webber Group, Inc., 787 F. Supp. 1480 (D.N.J. 1992) (dismissing RICO and public policy claims of retaliation when Plaintiff also alleged CEPA violations arising out of the same underlying facts).

In Count I of his complaint, Plaintiff alleges that "MARKETSTAR created both a hostile work environment and retaliated against Plaintitff . . . for raising concerns about racist comments

regarding a co-employee" in violation of NJLAD. (Compl. ¶ 19.) Thus, he clearly asserted a retaliatory discharge claim under NJLAD. Even if Plaintiff asserted a distinct hostile work environment claim in Count I of his Complaint, that claim is still susceptible to dismissal under CEPA's waiver provision because it stems from the same facts and circumstances underlying his CEPA claim and requires a showing of similar proofs. See Smith v. Twp. of E. Greenwich, 519 F. Supp. 2d 493, 510 (D.N.J. 2007), aff'd, 344 F. App'x 740 (3d Cir. 2009) (determining CEPA waiver provision required dismissal of NJLAD claim for retaliation and hostile work environment). Accordingly, summary judgment is granted as to Count I.

**COUNT II: PLAINTIFF'S CEPA CLAIM**

New Jersey's CEPA statute prohibits an employer from taking "any retaliatory action against an employee" who:

> *Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:*
>
> *(1) is in violation of a law, or a rule or regulation promulgated pursuant to law*

N.J.S.A. 34:19-3. To establish a claim of CEPA retaliation, Plaintiff must present a prima facie case of retaliatory action by demonstrating that: 1) he reasonably believed his employer's conduct violated a law, or rule or regulation pursuant to law; 2) he performed a whistleblowing activity by either disclosing or threatening to disclose the activity to a supervisor or public body, or objected to or refused to participate in the activity; 3) retaliatory action was taken against him; and 4) a causal connection exists between the whistleblowing activity and the adverse employment action. See N.J.S.A. 34:19-3(c); Kadetsky v. Egg Harbor Twp. Bd. of Educ., 82 F.

Supp. 2d 327, 340 (D.N.J. 2000). Once the plaintiff meets the prima facie burden, defendant must articulate a legitimate, non-discriminatory reason for its actions. Blackburn v. United Parcel Service, Inc., 179 F.3d 81, 92 (3d Cir. 1999) (citations omitted).

If Defendants satisfy this burden, the "presumption of retaliatory discharge created by the prima facie case disappears" and the burden reverts to Plaintiff who, within the context of a summary judgment motion, must offer sufficient evidence from which a reasonable jury may find that Marketstar's articulated reason for the discharge was pretexual and that retaliation for the whistleblowing indeed motivated the discharge. Blackburn, 179 F. 3d at 93. As such, the court must examine the evidence of record for "inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons." Sempier v. Johns & Higgins, 45 F.3d 724, 731 (3d Cir. 1995).

<u>**Plaintiff's Prima Facie Case**</u>

*Objective Reasonable Belief*

Initially, plaintiff must "set forth facts that would support an objectively reasonable belief" that a law, rule, or regulation has been violated. Dzwonar v. McDevitt, 177 N.J. 451, 463 (2003). Plaintiff allegedly informed Marketstar that Markson, a Caucasian Verizon supervisor, made a statement suggesting that Dawson, an African American Marketstar employee, should be reassigned from the Verizon store in suburban Westfield to one in inner-city Newark to "be with her own kind", and vowed to "ride" Dawson for the next month to ensure that the move could be justified by performance issues. On a separate occasion, Plaintiff allegedly reported that the same Verizon employee stated that a Hispanic Marketstar employee was likely a recovering drug addict due to his physical appearance and the fact that he resided "in a drug infested area of

11

Jersey City." (Def. SUF ¶¶ 34, 43.) Plaintiff states that he believed these comments violated Marketstar's anti-harassment policy as well as NJLAD. (Pl. Br. p. 18.)

Defendants counter that Markson's statements do not amount to the type of discrimination prohibited by NJLAD for three reasons: 1) Plaintiff, in his reports and during his deposition, described the comments as being "of a racial nature" and "inappropriate for the workplace" rather than discriminatory; 2) Plaintiff conceded at his deposition that the discriminatory adverse employment action that Markson vowed to orchestrate against Dawson did not occur and could not have occurred, given that it was Plaintiff who made staffing decisions for the Newark and Westfield locations; and 3) the comments were not severe or pervasive enough to create a hostile work environment. (Def. Br. pps. 14-17.)

As a threshold matter, this Court notes that CEPA's protection from retaliation extends to the disclosure of discriminatory conduct by a person or company with whom an employer maintains a business relationship. N.J.S.A. 34:19-3(a). Likewise, Marketstar's anti-harassment policy "prohibits unlawful harassment by any employee including . . . vendors, customers, independent contractors and any other persons." (Scirocco Decl., Ex, A.)  Furthermore, this Court is guided by the New Jersey Supreme Court's instruction that CEPA "'is a remedial statute . . . that should be construed liberally to effectuate its important social goal.'" Battaglia v. United Parcel Service, Inc., 214 N.J. 518, 555 (2013) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)).

Contrary to Defendants' assertion that Plaintiff did not characterize Markson's comments as being racially discriminatory, in his November 8, 2011 email to Kaleikini, Plaintiff remarked that Markson's comments about Santana, "could be considered racially bias [sic]" which, when combined with her previous comments about Dawson, signaled "a bigger issue that need[ed] to

be addressed." (Scirocco Decl., Ex. E.) He further stated in that email that he was making the complaint to "protect [his] team from being subjected to a hostile work environment or defamation . . ." (Id.) Moreover, Marketstar's own anti-harassment policy invites any employee to report, without fear of retaliation, "unlawful harassment" including "verbal conduct such as epithets, derogatory jokes or comments, slurs . . . based upon sex, race or other protected basis." (Scirocco Decl., Ex. A.) Therefore, this Court finds that plaintiff has adduced sufficient facts to demonstrate his objectively reasonable belief that Markson's comments violated a law, rule or regulation.

Further, Defendants' argument regarding the futility of Markson's intent to relocate Dawson are unpersuasive. The fact that the relocation did not or could not occur does not eliminate Plaintiff's claim. Rather, it is relevant that Plaintiff complained that the comment itself was indicative of unlawful racial animus. (See Scirocco Decl., Ex. E.); see also, Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 610 (1993) (finding that NJLAD does not require evidence of an actual change in working conditions for there to be a hostile work environment).

Next, as it relates to Markson's comments, accepting Plaintiff's allegations as true, a rational fact-finder may determine that a reasonable African American could consider them to be severe or pervasive enough to create a hostile or abusive work environment. See Taylor v. Metzger, 152 N.J. 490, 499-501 (1997) (finding that a single utterance of the epithet "jungle bunny" was invidious enough to pass the severe-or-pervasive test).

*Adverse Employment Action*

Sample asserts that he suffered two adverse employment actions: (1) reassignment to a different region within the Verizon program, and (2) his termination. Defendants do not dispute that termination is an adverse employment action, but disputes that Sample's transfer was an

13

adverse action, arguing that had the transfer been successful, Sample would have retained his job title, job responsibilities, and salary. To the extent that Sample asserts that his proposed transfer was part of a larger hostile environment created by Defendants in retaliation for his claimed protected conduct, it may constitute an adverse employment action under CEPA.  As the New Jersey Supreme Court explained in Green v. Jersey City Bd. of Educ., 177 N.J. 434, 445 (2003): "'[r]etaliation,' as defined by CEPA, need not be a single discrete action. Indeed, [it] can include . . . many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct."

Sample asserts that the transfer was designed to force him to resign as he would have been required to travel from his home in Elizabeth, New Jersey to Pennsylvania or Delaware on a daily basis. (Compl. ¶¶ 14-15.) Thus, a reasonable factfinder could conclude that the transfer was a hostile action insofar as it deprived Sample of a preferred post. The undesirable transfer and the eventual termination, combined, could support a conclusion that Defendants took an adverse employment action against Sample. See Green, 177 N.J. at 445.

*Causal Link*

To establish a prima facie case, Plaintiff must demonstrate a causal link between his whistle blowing activity[3] and the complained-of adverse employment action.  The New Jersey Supreme Court "has not required that there be proof of a direct causal link between the complaint by the employee and the retaliatory action by the employer." Battaglia, supra, 214 N.J. at 558. Rather, an employer's retaliatory motive may be inferred from all the circumstances relating to the claimed adverse employment action. Id. (internal citation omitted.) "[T]emporal proximity

---

[3] Because there is no dispute that Plaintiff reported Markson's comments, the court will not address whether or not Plaintiff engaged in whistle-blowing activity.

between the employee's [protected conduct] and the adverse employment action or a 'pattern of antagonism' on the part of the employer following the protected expression can raise the inference of causation." Espinosa v. Cnty of Union, 212 F. App'x 146, 153 (3d Cir. 2007). Considering the record as a whole, Sample's evidence of antagonism and temporal proximity could reasonably support a finding of causation.

On September 30, 2011, Plaintiff received a written review of his job performance for the months of July, August, and September of 2011. (Scirocco Decl., Ex. B.) He was awarded a weighted final score of 3.23 out of 4.0. (Id.) He first reported Markson's racial comments to Marketstar on October 28, 2011. (Scirocco Decl., Ex. C.) Ten days later, on November 7, 2011, Plaintiff was formally cited for poor performance over the objection of Solovey, who urged management to issue a verbal warning or "employee discussion" instead. (Scirocco Decl., Ex. G.) Sample had not been subject to any disciplinary action before that time. (Scirocco Decl., Ex. H.) Connors and Witmer demanded Plaintiff's removal from the Verizon account on January 3, 2012, and again on January 5, 2012. On January 19, 2012, Plaintiff was issued a second NOC and was terminated on January 27, 2012. This evidence, viewed in the light most favorable to Sample, could lead a reasonable factfinder to conclude that Sample's complaints triggered several antagonistic actions by Defendants that followed in relatively rapid succession. Such a finding would be sufficient to establish the requisite causal nexus element of Sample's prima facie case.

Defendants assert that Plaintiff's whistleblowing activities cannot be deemed a "substantial or motivating factor" for his termination because the Verizon decision makers who demanded Plaintiff's elimination from the Verizon account were not aware he engaged in protected conduct. (Def. Br. p. 18.) However, a genuine issue of material fact exists given the

15

testimony of Kaleikini. Kaleikini claimed she reported Markson's comments to Verizon in January 2012, even though the record reflects contact was made in February 2012. (Kaleikini Dep. 23:1-4, 42:1-12; Scirocco Decl., Ex. T.)

### **Marketstar's Legitimate Non-Discriminatory Reason**

Having established that Plaintiff has made a prima facie showing of retaliatory discharge, the burden of production now shifts to Marketstar to articulate a "legitimate, non-discriminatory reason for the employment decision." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). Marketstar successfully satisfies this burden by arguing that Plaintiff was terminated due to his failure to correct his well-documented performance issues, which Marketstar claims became apparent with enhanced oversight of Plaintiff's operations around March 2011, almost a year before his employment was terminated. (Def. Br. at pps. 21-22.) See D'Alessandro v. City of Newark, 454 Fed. App'x. 53, 56 (3d Cir. 2011) (finding that a long history of poor performance is a legitimate non-discriminatory reason for terminating an employee).

### **Pretext**

Defendants contends that even if Sample can establish a prima facie claim under CEPA, his claim must nevertheless fail because the record evidence does not show that the reasons for Defendants' actions were pretextual. To withstand summary judgment, Sample must point to some evidence, direct or circumstantial, from which a factfinder could either "(1) discredit [Marketstar's] articulated legitimate reasons or (2) believe that an invidious retaliatory reason was a motivating or determinative cause of [Marketstar's] action." Fuentes v. Perskie, 32 F.3d 759, 764 (3r Cir. 1994). "Typically, the types of evidence that the plaintiff must point to are inconsistencies or anomalies that could support an inference that the employer did not act for its

stated reasons." <u>Blackburn</u>, <u>supra</u>, 179 F.3d at 93. To satisfy this requirement, Plaintiff may rely upon the evidence proffered to support his prima facie case. <u>Fuentes</u>, <u>supra</u>, 32 F.3d at 764.

There is sufficient evidence from which a jury could reasonably find that Defendants' proffered legitimate, non-discriminatory reason for terminating Plaintiff was pretexual. As previously discussed, Plaintiff received two NOCs, without preliminary warnings as mandated by company policy, days after he complained of inappropriate racial comments. Moreover, Sample's performance was favorably reviewed through September 2011, four months before he was terminated. Consequently, this Court finds that Defendants are not entitled to summary judgment as to Count II.

### C. *Punitive Damages*

This Court declines to reach the issue of punitive damages in light of the foregoing analysis. Defendants may renew their application at the time of trial.

### IV. CONCLUSION

For the foregoing reasons, Marketstar's motion for summary judgment is **GRANTED** as to Count I and **DENIED** as to Count II. An Order accompanies this Opinion.

s/ Susan D. Wigenton, U.S.D.J.

cc:    Magistrate Judge Madeline C. Arleo